# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

ALENA L. LAGGNER,                    )
                                     )
    Plaintiff,               )
                                     )
v.                                   )     CAUSE NO. 1:14-cv-00272-SLC
                                     )
COMMISSIONER OF SOCIAL               )
SECURITY,                            )
                                     )
    Defendant.               )

## OPINION AND ORDER

Plaintiff Alena L. Laggner appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Supplemental Security Income ("SSI").[1] (DE 1). For the following

reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Laggner applied for SSI on December 12, 2011, alleging disability as of December 31,

2007, which she later amended to October 26, 2009.[2] (DE 11 Administrative Record ("AR") 11,

38, 191-96). The Commissioner denied Laggner's application initially and upon reconsideration.

(AR 88-89). After a timely request, a hearing was held on February 7, 2013, before

Administrative Law Judge Melinda W. Kirkpatrick ("the ALJ"), at which Laggner, who was

represented by counsel, and a vocational expert, Tim Shaner (the "VE"), testified. (AR 34-79).

---

[1] All parties have consented to the Magistrate Judge. (DE 14); *see* 28 U.S.C. § 636(c).

[2] Laggner had previously filed applications for both SSI and Disability Insurance Benefits ("DIB") in July 2009 and February 2011, which were denied initially and upon reconsideration. (AR 37-38, 80, 84, 172-90). The ALJ did not find a basis to reopen these prior applications. (AR 11). Laggner's date last insured for DIB purposes was September 30, 2010. (AR 37, 86).

On May 14, 2013, the ALJ rendered an unfavorable decision to Laggner, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform a significant number of light work jobs in the economy. (AR 11-24). The Appeals Council denied Laggner's request for review (DE 1-6), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

Laggner filed a complaint with this Court on September 5, 2014, seeking relief from the Commissioner's final decision. (DE 1). Laggner argues that the ALJ: (1) improperly discounted the credibility of her symptom testimony; (2) failed to adequately account for her mental limitations in the residual functional capacity ("RFC") and hypotheticals posed to the VE; and (3) constructively reopened her February 2011 disability application. (DE 15 at 13-24).

## II. FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Laggner was 43 years old (AR 24, 80); she had dropped out of school in the 11th grade, but later obtained her GED and completed a nine-month course to be an emergency medical technician (AR 42, 291, 330). Laggner has past work experience as a cashier, cook, caterer, waitress, and cleaning supervisor. (AR 330). In her application, Laggner alleged disability due to back problems, depression, and panic attacks. (AR 329).

### A. Laggner's Testimony at the Hearing

At the hearing, Laggner, who was five feet, five inches tall and weighed 198 pounds at the time, testified that she was single and had adult children; she described herself as "homeless," stating that she was currently staying with family and friends. (AR 40). She drives

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 820-page administrative record necessary to the decision.

short distances and performs her bathing and dressing independently 90 percent of the time.  (AR 57).  She performs light housework, but she usually has someone to help her with "major cleaning" and to take her shopping.  (AR 58).  She had health insurance through mid-2011, but was uninsured at the time of the hearing.  (AR 43).  Laggner asserted that on a good day, she can dress herself and sit outside on a bench, but on a bad day, she does not leave her room except to go to the bathroom.  (AR 48).  She typically naps two to four hours a day.  (AR 65-66).  She reported that she currently was not receiving medical attention, and thus, she was having two to three bad days a week; she did not have the funds to fill her prescriptions.  (AR 48, 52).

When asked why she thought she could not work, Laggner cited her back pain, as well as depression and panic attacks.  (AR 46).  She stated that she underwent a discectomy in both 2008 and 2009, as well as a surgery for another disc problem in her neck in 2011, which were all helpful for only a few months.  (AR 46-47, 49-50).  Laggner testified that she has low back pain "[u]sually every other day," stating that "[s]ome days it's just enough to where [she] can tolerate it without doing anything, and then there's days where [she] cannot even get out of bed."  (AR 48).  On a scale of one to 10, Laggner rated her pain on a good day as a "three or a four" and on a bad day as "blowing a ten off the scale."  (AR 48).  Laggner asserted that when standing, her back pain "starts to burn like it's a fire" and "after about five minutes of that it affects [her] breathing."  (AR 53-54, 67).  Every few weeks her back pain travels down into her left leg, causing numbness, tingling, and weakness.  (AR 51).

Laggner estimated that she could stand for five minutes at a time and sit for five to 10 minutes at a time; she prefers to lie on her side and spends 90 percent of an eight-hour period lying down.  (AR 53, 57).  She claimed that she could walk about 50 feet before she has to sit or

hold onto something. (AR 53). She also complained of a long history of left arm numbness two or three times a week, causing her problems with grasping and holding onto objects. (AR 68-69). Additionally, she stated that several days before the hearing, she began experiencing severe pain in her right arm, contending that she could not even raise it. (AR 69-70). She currently was taking Ultram, which she obtained from a free clinic. (AR 55-56). She also complained of having migraine headaches three to four times per month. (AR 63).

As to her mental health, Laggner stated that she feels stressed in large crowds, causing panic attacks; she prefers to stay at home. (AR 59). She was currently having panic attacks on a monthly basis, stating that they were more frequent when she was raising her children, taking paramedic classes, and "the bills weren't getting paid." (AR 59-60). She was supposed to participate in counseling at the Northeastern Center, but she did not have the funds to do so. (AR 60).

## B. Summary of the Relevant Medical Evidence

In October 2008, Laggner visited the emergency room due to low back pain, which was radiating into her left lower leg; she also complained of numbness and weakness in her left leg. (AR 382, 530-31, 527-28). An MRI showed multi-level degenerative bulging and left-sided disc herniation at L3-L4, and a CT scan showed diffuse disc bulging, spinal stenosis, and moderate neuroforaminal narrowing. (AR 383-84). She was prescribed Vicodin and given an injection of Toradol. (AR 528). Later that same month, Dr. Loi Phuong, a neurosurgeon, performed a left L3 partial hemilaminectomy and left L3-L4 discectomy and foraminotomy on Laggner. (AR 580-81).

In April 2009, Laggner visited the emergency room, complaining of nausea and chest

pain, which she thought was induced by stress.  (AR 389-93).  She had no pain or tenderness in her back and demonstrated normal range of motion and strength of her extremities.  (AR 392). She was diagnosed with anxiety and depression and given Ativan.  (AR 390).

In October 2009, Laggner returned to Dr. Phuong; she reported that she had "done well" after her first surgery, but that in the last week she started to experience low back pain that radiated into her left thigh with paresthesia.  (AR 431-32).  She had decreased light touch sensation in her left thigh, and a straight-leg raise test was positive on the left.  (AR 432).  An MRI showed a recurrent left L3-L4 paracentral disc protrusion.  (AR 432).  Dr. Phuong's treatment options included conservative treatment with physical therapy, injections, and pain medication or a second discectomy.  (AR 432).  Laggner opted for surgery, and later that month Dr. Phuong performed a second L3 partial hemilaminectomy and L3-L4 discectomy and foraminotomy.  (AR 400, 432).

Also in October 2009, Dr. Ben Williams performed a consultative examination at the request of the state agency; Laggner was five days postoperative of her second discectomy at the time.  (AR 419-22).  He observed that Laggner's ambulation, stability, coordination, range of motion, gait, strength, and fine motor skills were all normal; she was able to fully squat and walk on her heels and toes.  (AR 420-21).  She had mild difficulty getting on and off the exam table, but no difficulty with rising from a chair and dressing herself.  (AR 420).  A straight leg raise test was positive bilaterally.  (AR 421).  Sensation was intact, except for decreased light touch on the left lower leg.  (AR 421).  Dr. Williams found no objective functional limitations on examination with respect to Laggner's depression and anxiety, but noted her report of difficulty going out in public.  (AR 421).

In November 2009, Laggner underwent a disability evaluation by Galen Yordy, Ph.D.; she drove herself to the appointment. (AR 438-41). She reported symptoms consistent with moderate depression in the past two weeks, as well as generalized anxiety and panic attacks in noisy environments, crowded social situations, and unfamiliar circumstances. (AR 438). She had recently discontinued counseling services due to financial reasons, but stated that the Celexa prescribed by her primary physician was helpful. (AR 438). She stated that she takes no medications for her physical problems. (AR 438). On mental status exam, Laggner appeared to have average intelligence; at times she appeared rather tense, but she did not exhibit any problems with hallucinations, delusions, or psychomotor agitation or retardation. (AR 439). Overall, she demonstrated a full and appropriate range of affect, her manner of self-expression was unremarkable, and she was pleasant and cooperative. (AR 439). Laggner denied any problems with self care, household or shopping tasks, or financial management, but stated that she must be "watchful of her back" when performing these activities. (AR 440-41). She spends her time reading, watching television, playing computer games, and "rearrang[ing] her house." (AR 440). Dr. Yordy's diagnostic impressions were panic disorder without agoraphobia; generalized anxiety disorder; major depressive disorder, single episode, moderate, chronic, with psychotic features; and rule out attention deficit hyperactivity disorder, predominantly inattentive type. (AR 441). He assigned Laggner a Global Assessment of Functioning ("GAF") score of 60.[4]

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-

In December 2009, Laggner complained to Dr. Phuong of radiating pain into her right leg. (AR 501). She had normal strength in her lower extremities, and an MRI showed no disc herniation or nerve root compression. (AR 501). Dr. Phuong recommended conservative treatment and referred Laggner to a pain management specialist. (AR 501).

Also in December 2009, Laggner saw her primary care physician, Dr. Scott Armstrong. (AR 496). She reported that Celexa was working well for her depression, but that she was still having panic attacks, although less frequently. (AR 496). In January 2010, Laggner told Dr. Armstrong that she was taking Ativan when she felt a panic attack coming on, which was about every other day; overall, she reported that she was feeling better. (AR 494). Laggner returned to Dr. Armstrong several weeks later, reporting paranoid behaviors such as feeling constantly afraid and not wanting to leave her house or be seen by anyone; she denied any suicidal thoughts. (AR 492). Dr. Armstrong prescribed Seroquel and assessed atypical depressive disorder and concern of schizophrenia versus bipolar disorder with psychotic features. (AR 492). Several weeks later, Laggner reported that she had stopped taking Seroquel because it made her feel sleepy, nauseous, and "drunk constantly." (AR 491).

In June 2010, Laggner went to the emergency room for low back pain radiating to her left hip and knee. (AR 525). She rated her pain as a 10, stating that it was worse when rising from or sitting down on a chair; she also complained of occasional numbness. (AR 525). The

---

workers). *Id.* And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the medical sources of record used GAF scores in assessing Laggner, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

emergency room doctor prescribed her a Medrol Dosepak and Darvocet, recommended that she sleep on a firm surface, and instructed her to follow up with her family physician. (AR 526).

In December 2010, Laggner went to the emergency room with complaints of increasing back pain that was radiating into her hips in the last few days. (AR 523-24). On exam, she had diffuse tenderness over the lower lumbar paraspinous muscles and over the sciatic nerve, consistent with sciatica. (AR 523). She demonstrated normal range of motion and strength, and a straight leg raise test was negative. (AR 523). She was given a Demerol injection, prescribed Flexeril and Vicodin, and instructed to apply ice packs and see her family doctor. (AR 526).

Several days later, Laggner visited Dr. Armstrong, reporting that she was experiencing severe pain in her low back and right leg and that she could not sleep, sit, or lie down for long. (AR 546). She stated that she had not seen a pain management doctor because of her financial limitations. (AR 546). On exam, she had tenderness in her lumbar spine and buttocks, and a straight leg raise test was positive. (AR 546). Dr. Armstrong added Percocet and Prednisone to her medication regimen, encouraged a healthy diet, and stressed the importance of regular exercise. (AR 547). Laggner returned a week later and reported that she was 50 percent improved, even though the Percocet made her sleepy and she had stopped Prednisone after three days because it gave her a migraine. (AR 544). Dr. Armstrong started her on a Medrol Dosepak. (AR 545).

In January 2011, Laggner returned to Dr. Armstrong, complaining of worsening neck pain; she was taking Flexeril and Vicodin as needed, though the Vicodin made her feel nauseous. (AR 542). An MRI of Laggner's cervical spine several weeks earlier showed mild and near-moderate C5-C6 degenerative disc disease with an associated midline annular tear. (AR 521).

The following month, Laggner saw Dr. Phuong upon referral from Dr. Armstrong for a two-month history of neck pain. (AR 566). The pain was centered in her neck, but sometimes radiated into her arms; her neck was quite stiff and the pain worsened with neck extension, but she had normal strength and sensation. (AR 566). Dr. Phuong diagnosed a C5-C6 central and right paracentral disc protrusion and presented Laggner with options of conservative treatment or surgery. (AR 567). Laggner opted for surgery, and on March 2, 2011, Dr. Phuong performed an anterior C5-C6 discectomy and fusion. (AR 551-52).

In March 2011, Laggner underwent a psychological evaluation by Kenneth Bundza, Ph.D. (AR 591). Laggner was anxious and tearful, but she was cooperative; she stated that she had been homeless for the past seven months, living with various family and friends. (AR 592). The mental status exam revealed that Laggner had an average range of intelligence and was capable of managing her own funds. (AR 593). Her long-term memory was intact. (AR 592). Although she had access to medical care, she was currently not receiving any formal mental health treatment, other than medications prescribed by her family doctor, which gave Dr. Bundza the impression that she was "at baseline with her symptoms." (AR 591, 593). He did not anticipate any significant improvement, noting that her emotional issues were negatively influenced by her life situation and multiple psychosocial stressors (homelessness, no income, and family problems). (AR 592-93). He assigned her a GAF of 60 and diagnosed a major depressive disorder, recurrent, severe, without psychotic features; a panic disorder without agoraphobia; and a generalized anxiety disorder. (AR 593-94).

In April 2011, Laggner told Dr. Armstrong that she had doubled her Ativan because she could not control her thoughts when going to sleep. (AR 691). She was having a hard time

dealing with family stress and moving from place to place. (AR 691). She reported still having

neck pain. (AR 691). In June, Laggner presented to the emergency room with a panic attack

after she was kicked out of her daughter's home. (AR 697). She stated that she usually takes

Ativan for a panic attack, but was vomiting and could not keep them down. (AR 697). She

denied any suicidal ideation. (AR 697). One week later, Laggner went to another emergency

room, reporting suicidal thoughts and feeling scared, depressed, and abandoned. (AR 726). She

stated that her children did not want anything to do with her and think she is faking her panic

attacks to gain attention. (AR 726). The emergency room doctor assessed depression, suicidal

ideation, and anxiety; Laggner was voluntarily admitted to the Northeastern Center. (AR 725-

26).

When discharging Laggner from the Northeastern Center two days later, Dr. Lynnea

Carder wrote that Laggner's mood was depressed; her thought process was logical, coherent, and

goal directed; and her thought content was without any psychosis or perceptual disturbances.

(AR 734). Laggner denied violent or angry thoughts; her memory was intact, and her attention

and concentration were normal. (AR 734). Dr. Cardner wrote that Laggner had "very quickly

returned to normal" upon admission and that she had limited insight into the role she played in

her family problems. (AR 735). A case manager talked with one of Laggner's daughters who

stated that Laggner was causing a lot of the problems herself, was attention-seeking, and would

barge into family homes after being asked not to do so. (AR 735). Laggner was pleasant and

cooperative throughout her stay, stating that her thoughts of self harm did not return; upon

discharge, Laggner planned to reside with a daughter until she moved to Florida to stay with a

brother. (AR 735). At no time during Laggner's stay did hospital staff observe any panic

attacks. (AR 735). Dr. Cardner assigned Laggner a GAF score of 35 upon admission and 50 upon discharge. (AR 733).

In May 2011, Laggner visited the emergency room four days in a row, complaining of progressively worsening back pain. (AR 628-46, 656-76). On the fourth visit, she was admitted, rating her pain as a 10. (AR 661-62). An MRI showed lumbar spondylosis, disc and facet degenerative changes with posterior left L3-L4 disc protrusion, mass effect upon the left L4 nerve root, minimal L3-L4 and L4-L5 degenerative central canal stenosis, minimal bilateral L5-S1 facet arthropathy, wedge configuration of L1, and multilevel lumbar Schmorl's nodes. (AR 673). A thoracic MRI showed spondylosis and disc degenerative changes, with small disc protrusions at T7-T8 and T10-T11. (AR 675). Laggner was discharged two days later on May 20, 2011, with diagnoses of L4 radiculopathy, L3-L4 and L4-L5 degeneration, and depression; she rated her pain as a six at the time. (AR 644, 664). Although the hospital had difficulty finding a pain specialist that would see Laggner because of her lack of health insurance, it did manage to schedule a consultation for her later that same day with Dr. Chandan Chauhan Negi at Neuro Northeast. (AR 664).

At the consultation, Laggner told Dr. Negi that her mid-thoracic pain was aggravated by deep breathing and physical exertion. (AR 679). She stated that her surgeries had helped her lower back pain, but that she began to have increased pain a year later. (AR 679). Dr. Negi diagnosed acute pain syndrome at a non-surgical site, disc herniation at T7-T8 and T10-T11, and acute mid-thoracic lumbar pain. (AR 680). He set a pain management appointment with a colleague and recommended that Laggner continue taking Vicodin and Ibuprofen. (AR 681).

On June 3, 2011, Laggner was seen by Dr. Daniel Roth at the Centers for Pain Relief for

her complaints of low back pain radiating into her left leg and neck pain. (AR 682). She rated her back pain as a three, but stated that it increases to a 10 when she sits or stands, sometimes making it hard to breathe; she rated her neck pain as a six, stating that it radiates into her left arm. (AR 682). She indicated that her pain is decreased with prescription medications and inactivity, but aggravated by bending, lifting, and sitting. (AR 682). She admitted being prescribed Vicodin and Flexeril, stating that she was taking them "on a PRN basis." (AR 682). Upon exam, Laggner demonstrated essentially normal strength and sensation, except for some decreased light touch in the left L5 and left C7 dermatomes and slightly reduced strength in her left ankle and hand. (AR 683). Dr. Roth diagnosed lumbar radiculopathy L5; sacroiliitis, left greater than right; lumbar facet arthropathy, left greater than right, and cervical radiculopathy left C7. (AR 684). He prescribed Lyrica and referred Laggner for a series of spinal injections. (AR 684; *see* AR 685-89, 713, 719). On June 21, 2011, Laggner saw Dr. Phuong, who noted that Laggner had persistent neck pain. (AR 709). He observed that a cervical x-ray revealed that the bone graft and instrumentation were in good position; he encouraged her to continue care with Dr. Roth. (AR 709).

In February 2012, Laggner underwent a physical examination by Dr. Venkata Kancherla as part of her disability application. (AR 765). She was anxious, hyperventilating, and grunting throughout the examination. (AR 767). She exhibited normal strength and gait, and she was able to walk on her heels and toes and partially squat; her dexterity was normal. (AR 766-67). She could recline, get up from a chair, take off and put on her socks by crossing her legs, and get on and off the table without assistance. (AR 766). Dr. Kancherla's "only significant physical findings" were impaired sensation in Laggner's left upper and lower extremities overlying

dermatomes L4, L5, and S1; impaired vibration over her left foot; and positive straight leg tests bilaterally. (AR 767). Laggner was taking only over-the-counter medications at the time. (AR 774).

That same month, Laggner underwent a mental status examination by Robert Walsh, Psy.D., as part of her disability application. (AR 762-64). Laggner complained of having panic attacks every two to three weeks, feelings of loneliness, a depressed mood, difficulty sleeping, fatigue, poor concentration, and recurrent thoughts of death; she denied any current suicidal ideation, hallucinations, or delusions. (AR 762-63). On mental status exam, Laggner's affect was animated, and her mood was anxious and extremely tearful. (AR 763). Her thought processes were logical; her attention, concentration, insight, and judgment all appeared fair. (AR 763). Dr. Walsh assigned her a GAF score of 49 and diagnoses of major depressive disorder, recurrent, severe without psychotic features; and panic disorder with agoraphobia. (AR 764).

In July 2012, Laggner returned to the emergency room with complaints of back and right hip pain that had been worsening in the past few days. (AR 801). She claimed she was unable to walk, yet had walked into the emergency room; when the doctor pressed her a bit more about the details of walking, Laggner admitted she was able to do so. (AR 801). A straight leg raise test on the right was negative; she initially could not lift the leg, but with some encouragement she was able to hold it off of the bed. (AR 801). She felt a little better after receiving some Decadron, Valium, and Toradol. (AR 802). The doctor found imaging tests unnecessary, prescribed Flexeril in addition to her other medications, and instructed her to see her family doctor. (AR 802).

Laggner visited the emergency room several times in April and May of 2013. (AR 814,

817, 819). She was diagnosed with back pain, sciatica, or a headache; prescribed Hydrocodone, Flexeril, or Prednisone; and instructed to see her family doctor. (AR 814-20).

Laggner's records were reviewed by state agency physicians R. Fife, M.D., in December 2009; Fernando Montoya, M.D., in March 2011; and M. Brill, M.D., in February 2012. (AR 443-50, 595-602, 783-90). These doctors concluded that Laggner could lift 10 pounds frequently and 20 pounds occasionally; stand or walk about six hours in an eight-hour workday; sit for six hours in an eight-hour workday; perform unlimited pushing or pulling (within her lifting restrictions); and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. (AR 443-47, 595-602, 783-90).

Additionally, Laggner's records were reviewed by Donna Unversaw, Ph.D., a state agency psychologist, in December 2009, who concluded that although Laggner had mild restrictions in daily living activities and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, she retained the capacity to perform routine tasks on a sustained level without special considerations. (AR 453-55). Dr. Unversaw reviewed Laggner's records again in March 2011 and found that although Laggner had mild difficulties in daily living activities and in maintaining concentration, persistence, or pace, and moderate difficulties in maintaining social functioning, she could still perform unskilled tasks consistent with her physical abilities. (AR 603-19). Similarly, in February 2012, Stacia Hill, Ph.D., a state agency psychologist, concluded that although Laggner had mild difficulties in daily living activities and in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, she could still perform simple tasks, attend to task for sufficient periods of time to complete tasks, manage the stresses involved with simple

work, and relate on at least a superficial basis with coworkers and supervisors. (AR 769-79, 791-94).

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a plaintiff is entitled to SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

In determining whether Laggner is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required her to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Id.* at 885-86.

### B. The Commissioner's Final Decision

On May 14, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 11-24). The ALJ noted at step one of the five-step analysis that Laggner had not engaged in substantial gainful activity since her application date of

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 416.920(e), 416.945. The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 416.920(e), 416.945(a)(5).

December 12, 2011. (AR 13). At step two, the ALJ found that Laggner had the following severe impairments: degenerative disc disease of the spine, status post cervical fusion and lumbar surgery (discectomy and foraminotomy), depression, and anxiety. (AR 13).

At step three, the ALJ concluded that Laggner did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 19). Before proceeding to step four, the ALJ determined that Laggner's symptom testimony was not fully credible and assigned her the following RFC:

> [T]he claimant has the [RFC] to perform and sustain light work . . . with lifting 20 pounds occasionally [and] 10 pounds frequently, standing or walking six hours total in an eight-hour workday, and sitting six hours total in an eight-hour workday. She can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, crawl; and never climb ladders, ropes or scaffolds. She can perform simple, routine, and repetitive tasks in a work environment free of fast paced production requirements, involving only simple, work-related decisions, with few, if any, work place changes, and only superficial interaction with the public, coworkers, and supervisors.

(AR 21).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Laggner was unable to perform any of her past relevant work. (AR 22). The ALJ then concluded at step five that she could perform a significant number of other light work jobs within the economy, including housekeeper, cashier, and laundry worker.[6] (Tr. 23). Accordingly, Laggner's claim for SSI was denied. (AR 24).

---

[6] In addition, the VE testified at step five that even if the hypothetical individual with Laggner's RFC, experience, and education were further limited to sedentary work (lifting 10 pounds occasionally, standing or walking two hours in an eight-hour period, and sitting for six hours in an eight-hour period), such individual could still perform a significant number of sedentary jobs in the economy, including packager, assembler, and inspector. (AR 73). Thus, even if Laggner were limited to sedentary work instead of light work, the outcome would be the same.

### C. The ALJ's Credibility Determination Will Be Not Be Disturbed

Laggner first argues that the ALJ improperly discounted the credibility of her symptom testimony. However, the ALJ's credibility determination, though imperfect, has adequate support in the record, and thus, will not be disturbed.

Because the ALJ is in the best position to evaluate a witness's "truthfulness and forthrightness," an ALJ's credibility determination is entitled to special deference. *Shideler v. Astrue*, 888 F.3d 306, 310-11 (7th Cir. 2012); *see Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and she articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness"); *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1995) ("[Because] the ALJ is in the best position to observe witnesses, [courts] usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." (citations omitted)).

Here, the ALJ found that Laggner had an underlying medically determinable physical impairment that could reasonably be expected to produce her alleged symptoms. (AR 21). However, after reviewing the objective medical evidence, Laggner's statements, her use of medication and treatment, and her daily activities, the ALJ concluded that Laggner's statements concerning the intensity, persistence, and limiting effects of her symptoms were not fully

credible.  (AR 22).  In doing so, the ALJ articulated:

> [Laggner's] daily activities . . . are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.  The documented objective findings failed to support the severity of symptoms alleged and the evidence suggest[s] that the claimant exaggerated symptoms and limitations.  In fact, in July 2012, she reported an inability to walk, but when called on it by the examiner, she admitted she could walk.  The record reflects that she made inconsistent statement(s) on various matters relevant to the issue of disability.  She testified that [] two or three weeks after her first surgery her pain returned, but medical records showed that months later she reported no back pain or tenderness, and had normal range of motion. . . .  Additionally, despite the complaints of allegedly disabling symptoms, the claimant stated that she only used over the counter medications for physical symptoms, and documented findings on emergency room visits tend[ed] to be fairly normal.  She has not sought or received ongoing treatment from a mental health specialist (medication prescribed by her primary general practitioner).

(AR 21-22).

Significantly, Laggner does not dispute the ALJ's observation that the severity of her complaints are not supported by the objective medical evidence.  (DE 15 at 18).  Nor does Laggner dispute the ALJ's statement that the documented findings at her emergency room visits tended to be fairly normal.  (DE 15 at 18).  Rather, Laggner challenges the other factors cited by the ALJ, emphasizing that an ALJ must not discredit a claimant solely for the reason that her symptoms are not fully substantiated by the objective medical evidence.  (DE 15 at 18 (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009))).  Laggner, however, has a tough hill to climb as an ALJ's credibility assessment "will stand 'as long as [there is] some support in the record.'"  *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (alteration in original) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

As an additional factor to the objective medical evidence, the ALJ observed that the evidence suggests Laggner exaggerated her symptoms and limitations.  To illustrate this point,

the ALJ cited Laggner's July 2012 visit to the emergency room where she told the doctor that she was unable to walk, but after the doctor pressed her a bit and noted that she had walked into the emergency room, Laggner conceded that she was indeed able to walk.  (AR 21-22 (citing AR 801)).  Laggner criticizes the ALJ's finding, asserting that Laggner "was not speaking in the literal sense."  (DE 15 at 15).  But the emergency room doctor specifically documented the inconsistency he observed between Laggner's description of her physical ability and his observation of her physical performance.  Thus, the ALJ's observation is neither "patently wrong" nor "divorced from the facts contained in the record."  *Berger*, 516 F.3d at 546.  As such, the ALJ's observation must stand.  The Court "do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner."  *Clifford*, 227 F.3d at 869 (citations omitted).

As an additional factor, the ALJ found that Laggner had made inconsistent statements on various matters relevant to the issue of disability.  As an example, the ALJ stated that Laggner testified that her back pain had returned within two to three weeks of her first surgery in October 2008, but that "medical records show that months later she reported no back pain or tenderness and had normal range of motion."  (AR 22).  Laggner challenges this example, stating that it is unclear to which "medical records" the ALJ was referring because none were cited, and in any event, she actually testified that her pain returned several months after her first surgery, not weeks.

It is apparent, however, that the ALJ was referring to Laggner's April 2009 visit to the emergency room for chest discomfort, headache, and nausea, summarized earlier in the ALJ's decision.  (AR 14).  As the ALJ noted, the emergency room evaluation reflected that Laggner

was without back pain or tenderness and had normal range of motion and strength in her extremities. (AR 392). Laggner is correct, however, that she testified her pain returned "only a couple of months" after her first surgery, rather than within two to three weeks as the ALJ recited. (AR 49). But that still doesn't make Laggner's statement fully credible. By the April 2009 emergency room visit, six months had passed since her first surgery, and Laggner was without back pain or tenderness and had normal range of motion and strength in her extremities. (AR 382). Furthermore, in October 2009, which was a full year after her first back surgery, Dr. Phuong wrote that Laggner "*did well until one week ago*, when she developed recurrent low back and left leg pain." (AR 431 (emphasis added)). Therefore, even though the ALJ misquoted Laggner's testimony by stating "weeks" rather than "months," Laggner's testimony that her pain returned within "only a couple of months" was still not fully credible.[7] *See Hill v. Astrue*, No. 1:08-cv-0740-DFH-JMS, 2009 WL 426048, at *10 (S.D. Ind. Feb. 20, 2009) (discounting a claimant's credibility where discrepancies were noted between her testimony and her statements to her physicians); *see generally Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." (citations omitted)).

Two other factors that the ALJ considered were that Laggner was using only over-the-counter medications for her physical symptoms at the time, and that she had not sought or received any ongoing mental health treatment from a mental health specialist, taking only

---

[7] As the ALJ acknowledged, "[a]lthough inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, . . . the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable." (AR 22).

medication prescribed by her general practitioner. (AR 48, 52, 60, 767). An ALJ is instructed to consider a claimant's use of medication, together with the treatment she has received. *See* 20 C.F.R. § 416.929(c)(3). Laggner, however, asserts that the ALJ violated Social Security Ruling 96-7p by improperly drawing a negative inference from her failure to seek medication and treatment without first considering her explanation for that failure—the loss of her health insurance and her financial restrictions. 1996 WL 374186, at *7-8 (July 2, 1996); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).

But the record reflects that the ALJ was well aware of Laggner's loss of health insurance, her receipt of free care from a community clinic, and her financial restrictions, as these topics were specifically mentioned at the hearing and in the ALJ's decision. (AR 19, 43, 52, 55, 60-62). The ALJ also considered Dr. Kancherla's examination in February 2012, which revealed just minimal physical findings and observed that Laggner was taking only over-the-counter medications at the time. (DE 18 (citing DE 767)). Similarly, in June 2011, Dr. Roth noted that Laggner admitted being prescribed Vicodin and Flexeril, but reported taking them "on a PRN basis," that is, only as needed. (AR 682). In fact, at the hearing, Laggner testified that her back pain was occurring just "every other day." (AR 48). Additionally, the ALJ observed that Laggner's symptoms improved when she did take prescription medication. (AR 19, 56, 544, 682). Nor is there evidence that Laggner sought regular treatment from a mental health specialist even when she was insured. (*See, e.g.*, 593). Considering the record as a whole, the ALJ did not run afoul of Social Security Ruling 96-7p when stating that Laggner relied on over-the-counter medications for her physical symptoms and did not seek regular treatment from a mental health specialist. (AR 19). *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674,

678-69 (7th Cir. 2010) (collecting cases holding that "tidy packaging" is not required in ALJs' decisions because the courts read them "as a whole and with common sense").

As an additional factor, the ALJ considered Laggner's daily activities, viewing her ability to perform her own personal care, laundry, dishes, and household tasks as "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (AR 21). It is appropriate for an ALJ to consider a claimant's daily activities as a factor when evaluating a claimant's credibility. SSR 96-7p, 1996 WL 374186, at *3; *see Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (affirming the ALJ's consideration of the claimant's ability to perform light household chores, drive a car, and shop for groceries when assigning an RFC for light work with limitations). Laggner argues, however, that the ALJ failed to adequately explain how her minimal daily activities were inconsistent with her testimony of disabling limitations. The Court agrees that the ALJ should have more specifically explained how Laggner's daily activities were inconsistent with her subjective complaints. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[A]n ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence."). Consequently, the Court finds the ALJ's comment about Laggner's daily living activities cannot be viewed as supporting her credibility determination.

The question, then, boils down to whether the ALJ's credibility determination can stand on the other factors provided by the ALJ and discussed above. In that regard, the Seventh Circuit has recognized that an ALJ's reasoning need not be perfect. *Halsell v. Astrue*, 357 F. App'x 717, 723 (7th Cir. 2009) ("[A]lthough the ALJ's reasoning is imperfect, there is substantial evidence supporting her decision to discount [the claimant's] credibility."). "[A]n

ALJ's credibility assessment will stand 'as long as [there is] some support in the record.'" *Berger*, 516 F.3d at 546 (alteration in original) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

Here, on balance, the lack of explanation in the ALJ's credibility reasoning concerning Laggner's daily activities is not enough to undermine her decision that Laggner's testimony was less than fully credible. *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) ("Though the ALJ's credibility determination was not flawless, it was far from 'patently wrong.'"). "Not all of the ALJ's reasons must be valid as long as *enough* of them are, and here the ALJ cited other sound reasons for disbelieving [Laggner]." *Halsell*, 357 F. App'x at 722-23 (citations omitted); *see also McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (affirming the ALJ's credibility determination even though it "was not without fault"). That is, the other reasons provided by the ALJ in discounting Laggner's credibility—a lack of objective medical evidence, statements suggesting exaggeration or inconsistency, reliance on over-the-counter medications, and lack of ongoing treatment from mental health specialists—all have some support in the record.

Moreover, as the ALJ observed, the record does not contain any opinion from a treating or examining doctor indicating that Laggner is disabled or has limitations greater than those assessed by the ALJ in the RFC.[8] (AR 22). To reiterate, "[t]he claimant bears the burden of producing medical evidence that supports her claims of disability." *Dichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008). Laggner "cannot fault the ALJ for her own failure to support her claim for disability." *Hildebrandt v. Astrue*, No. 3:09-CV-210 CAN, 2010 WL 670211, at *6

---

[8] Furthermore, as observed *supra* in footnote 6, even if the ALJ had limited Laggner to sedentary work instead of light work, the outcome would be the same.

(N.D. Ind. Feb. 19, 2010) ("A claimant must provide evidence showing how their impairment affects their functioning during the time claimant alleges disability, and any other information that is needed to decide the disability claim." (citing 20 C.F.R. § 404.1512(c))); *see Kasberger v. Astrue*, No. 06-3868, 2007 WL 1849450, at *4 (7th Cir. June 27, 2007) ("An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." (citation omitted)).

Thus, contrary to Laggner's assertion, the ALJ adequately considered the credibility of Laggner's symptom testimony in accordance with the factors identified in 20 C.F.R. § 416.929(c)(3) and SSR 96-7p. In doing so, the ALJ sufficiently built an accurate and logical bridge between the evidence and her conclusion, and Laggner has not shown that the ALJ's determination is "patently wrong." *Shramek*, 226 F.3d at 811; *Powers*, 207 F.3d at 435. Accordingly, the ALJ's credibility determination, which is entitled to special deference, must stand. *See Powers*, 207 F.3d at 435.

### D. The Mental RFC Assigned by the ALJ Adequately Accounted for Her Mental Limitations

Next, Laggner argues that the RFC assigned by the ALJ does not adequately account for all of her mental limitations, asserting that she "has been diagnosed with a depressive disorder, an anxiety disorder, and a panic disorder." (DE 15 at 20). She contends that as a result of these impairments, she is afraid to leave the house and be in proximity to others, has no motivation or energy, and is anxious and fatigued throughout the day. Laggner argues that if the ALJ had properly accounted for these limitations, the ALJ would have found that she cannot leave the house or attend work consistent with competitive employment and cannot work in noisy environments or in proximity to others. (DE 15 at 21).

The RFC is a determination of the tasks a claimant can do despite her limitations.  20 C.F.R. § 416.945(a)(1).  The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence."  SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. § 416.945.  Therefore, when determining the RFC, the ALJ must consider all medically determinable impairments, mental and physical, even those that are non-severe.  20 C.F.R. § 416.945(a)(2); *see Craft*, 539 F.3d at 676.  The determination of a claimant's RFC is reserved to the Commissioner.  *See* 20 C.F.R. § 416.9546(c); SSR 96-5p, 1996 WL 374183, at *4.

Here, the ALJ limited Laggner to work involving only "simple, routine, repetitive tasks in a work environment free of fast paced production requirements, involving only simple, work-related decisions, with few, if any, work place changes, and only superficial interactions with the public, coworkers, and supervisors."  (AR 21).  In considering the RFC, the ALJ observed that the record did not contain *any* medical source opinion indicating that Laggner was disabled or that assigned her limitations exceeding those in the RFC ultimately assigned.  (AR 22).  "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [her] claim of disability."  *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)).

Moreover, the assigned mental RFC is supported by the opinions of Drs. Hill and Unversaw, the state agency psychologists, and the ALJ relied on these opinions.  (*See* AR 22).

Dr. Hill opined in March 2012 that despite Laggner's mental limitations, she could "understand, remember, and carry-out simple tasks," "relate on at least a superficial basis on an ongoing basis with co-workers and supervisors," "attend to task for sufficient periods of time to complete tasks," and "manage the stresses involved with simple work." (AR 794). In addition, Dr. Unversaw opined in March 2011 that Laggner appeared to have the capability to perform unskilled tasks consistent with her physical abilities. (AR 605). The mental RFC assigned by the ALJ is consistent with, and even more conservative than, the limitations assigned by these state agency psychologists. Of course, "[s]tate agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 416.927(f)(2)(i). "The regulations, and this Circuit, clearly recognize that reviewing physicians and psychologist[s] are experts in their field and the ALJ is entitled to rely on their expertise." *Ottman v. Barnhart*, 306 F. Supp. 2d. 829, 839 (N.D. Ind. 2004) (citations omitted).

Nevertheless, Laggner argues that the ALJ improperly "played doctor" when she assigned mental restrictions in the RFC that were more conservative than those assigned by the state agency psychologists. (DE 22 at 2). But that argument has no traction. "[A]n ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (citation omitted). As explained above, the determination of a claimant's RFC is reserved to the Commissioner and is based upon consideration of *all* relevant evidence in the case record. SSR 96-5p, 1996 WL 374183, at *4-5; 20 C.F.R. § 416.945.

Laggner further argues that her diagnoses of depression, anxiety, and a panic disorder are

sufficient to warrant a more restrictive RFC, contending that these disorders "could reasonably be expected to cause her symptoms of . . . paranoia, isolative behavior, social withdrawal, agoraphobia, and panic attacks." (DE 22 at 4). But the diagnosis of an impairment does not alone establish its severity and its resulting limitations. *See Carradine*, 360 F.3d at 754 ("The issue in the case is not the existence of these various conditions of [claimant's] but their severity and, concretely, whether . . . they have caused her such severe pain that she cannot work full time."); *Bucholz v. Astrue*, No. 08-cv-4042, 2009 WL 4931393, at *11 (C.D. Ill. Dec. 15, 2009) ("The issue for disability benefits is not whether a claimant has a disease, but whether that disease affects her ability to work." (citing 20 C.F.R. § 416.945(a)(1))). As emphasized above, Laggner failed to produce any medical source opinion stating that the symptoms from her various diagnoses were disabling—a burden that was hers to bear. *See Eichstadt*, 534 F.3d at 668; 20 C.F.R. § 416.912(c).

In sum, the mental RFC assigned by the ALJ is supported by the opinions of the state agency psychologists, and there are no other medical source opinions of record assigning Laggner greater mental limitations. As such, the mental RFC, which is a finding reserved to the Commissioner, will be affirmed.

### E. The ALJ Did Not Constructively Reopen Laggner's Prior DIB and SSI Applications

Laggner's final argument is that the ALJ constructively reopened her February 2011 applications for DIB and SSI "by considering the merits of [her] claim as early as 2008." (DE 15 at 22). Laggner's argument is unpersuasive.

"There are two ways in which a case may be reopened. The ALJ may make an express determination pursuant to 20 C.F.R. § 404.988 that the case should be reopened or the ALJ may

'constructively' reopen the case by reconsidering the prior claim on its merits." *Girard v. Chater*, 918 F. Supp. 42, 44 (D.R.I. 1996) (collecting cases). "A prior disability claim is not deemed to have been reconsidered on the merits merely because the evidence reviewed by the ALJ included evidence of the claimant's condition at the time of the previous application." *Id.*; *see Pugh v. Bowen*, 670 F. Supp. 812, 813 (N.D. Ill. 1987) ("[R]eview of all the medical evidence in the case (including that which was previously submitted) is not the equivalent of reviewing the merits of the claims decided in prior proceedings."). Indeed, "[a]n ALJ is entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary to determine whether the claimant was disabled at the time of his second application." *Girard*, 918 F. Supp. at 44 (citation omitted); *see Pugh*, 670 F. Supp. at 813 ("There is nothing in the record to indicate that the *merits* of the old petitions were considered. What was considered was the entire medical file containing new and old matters to enable the ALJ to decide present disability and its onset.").

Here, the ALJ reasonably considered all of the medical evidence presented to her, which dated back to 2008. (AR 11). No statement by the ALJ, however, fairly implies that she was reopening old matters; in fact, in the introductory paragraph of her decision the ALJ specifically stated that she was *not* reopening Laggner's prior applications. (AR 11 ("The undersigned does not find a basis for reopening the claimant's prior Title XVI applications (20 CFR 416.1488).").) Consistent with this introductory statement, the ALJ throughout the decision stated that she was considering Laggner's December 12, 2011, application for SSI.

In that regard, the ALJ specifically noted in the statement of issues that although SSI is not payable prior to the month following the month in which the application was filed, she

"considered the complete medical history consistent with 20 CFR 416.912(d)."  (AR 11).  In that

same section, the ALJ concluded that Laggner was not disabled "since December 12, 2011, the

date the application was filed."  (AR 11).  Likewise, in her Findings of Fact and Conclusions of

Law, the ALJ found at step one that Laggner had not engaged in substantial gainful activity

"since December 12, 2011, the application date."  (AR 13).  And when concluding her Findings

of Fact and Conclusions of Law, the ALJ found that Laggner had "not been under a disability . . .

since December 12, 2011, the date the application was filed."  (AR 24).

     As such, there is no indication that the ALJ reconsidered the previous denial of disability

benefits or that she purported to determine whether Laggner was disabled *before* December 12,

2011.  Rather, as already observed, the ALJ specifically refused to reopen Laggner's prior claims

for DIB and SSI.  Any observations the ALJ made about Laggner's impairments at the time of

the previous applications were made in the context of determining whether she was disabled for

SSI purposes as of December 12, 2011.  *See Girard*, 918 F. Supp. at 45-46; *Pugh*, 670 F. Supp.

at 813.  Consequently, Laggner's assertion that the ALJ constructively reopened her February

2011 DIB and SSI applications is unavailing.

## V.  CONCLUSION

     For the foregoing reasons, the decision of the Commissioner is AFFIRMED.  The Clerk

is directed to enter a judgment in favor of the Commissioner and against Laggner.

     SO ORDERED.

     Enter for this 30th day of March 2016.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge